## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KENNETH D. EISENBRAUN, an
Individual, and UNITED GLOBAL
SOURCING, INC., a Michigan
corporation,

      Plaintiffs and Counter-defendants,

vs.

TEK MOBILE, INC., a California
corporation, and HONG LIP YOW, an
Individual,

      Defendants and Counter Plaintiffs.

Case No. 18-cv-12013-VAR
Hon. Victoria A. Roberts

---

**Thomas M. Schehr (P54391)**
**Andrew J. Kolozsvary (P68885)**
DYKEMA GOSSETT PLLC
Attorneys for Plaintiffs and Counter-
Defendants
400 Renaissance Center, 37th Floor
Detroit, MI 48243
(313) 568-6800

**Kenneth L. Gross (P34734)**
**Jeffrey B. Linden (P58007)**
THAV GROSS PC
Attorneys for Defendants and
Counter-Plaintiffs
30150 Telegraph Road, Ste. 444
Bingham Farms, MI 48025
Tel:  (248) 645-1700
Fax:  (248) 645-8205
Email:kengross@thavgross.com
Email:jlinden@thavgross.com

---

## DEFENDANTS' COUNTERCLAIM

Counter-Plaintiffs TEK MOBILE, INC. and HONG LIP YOW, for their

counterclaim against Counter-Defendants KENNETH D. EISENBRAUN and

UNITED GLOBAL SOURCING INC. state as follows:

## PARTIES AND JURISDICTION

1.      Counter-Plaintiff TEK MOBILE, INC. is a California corporation with its principal place of business in California.

2.      Counter-Plaintiff HONG LIP YOW is an individual domiciled in California.

3.      Upon information and belief Counter-Defendant KENNETH D. EISENBRAUN ("Eisenbraun") is an individual domiciled in Michigan.

4.      Upon information and belief Counter-Defendant UNITED GLOBAL SOURCING, INC. ("USG") is a Michigan corporation with its principal place of business or registered office in Troy, Michigan. Collectively Eisenbraun and USG are referred to below as Counter-Defendants.

5.      This Court has supplemental subject matter jurisdiction of this counter-complaint pursuant to 28 U.S.C. § 1367, and subject matter jurisdiction under 28 U.S.C § 1332(a), 28 U.S.C. § 2201, and Fed. R. Civ. Proc. 57. Counter-Plaintiffs being informed and believe that the amount in controversy exceeds $75,000 and the action is between citizens of different states; there exists and actual controversy between the interested parties before the court and within the Court's jurisdiction.

6.      This Court has personal jurisdiction over Counter-Defendants because the claims arise out of Counter-Defendants' actions and transactions of business and dealings in this District within the State of Michigan and Counter-Defendants are citizens of and domiciled in the State of Michigan.

7.     Venue is proper under 28 U.S.C. § 1391 because all Counter-Defendants are residents of the State of Michigan and this Judicial District.

## GENERAL ALLEGATIONS

8.     Eisenbraun and Tek Mobile, Inc. entered into a written contract for the sale of Eisenbraun's membership interest in FoneGear, LLC, a Michigan Limited Liability Company (hereafter "FoneGear" or the "Company"). The agreement is entitled "Membership Interest Purchase Agreement of Fonegear, LLC by and between Kenneth D. Eisenbraun, Seller and Tek Mobile, Inc., Buyer" ("the Agreement").  See Agreement at **Exhibit 1**.

9.     The Agreement provides in pertinent part:

a.     That the total purchase price for 100% of the membership interest in FoneGear shall be "$750,000 (the "Estimated Purchase Price), minus or plus any adjustments pursuant to Section 1.3 through 1.5 (the "Purchase Price").  See Exhibit 1 at Section 1.2.

b.     That an initial payment of $250,000 be paid on or before March 20, 2018 (the "Closing Date"), and any balance of the Purchase Price to be paid in three equal installments. Exhibit 1, at Section 1.2

c.     That "The Estimated Purchase Price shall be downward adjusted for half of all rent due under the lease …" for the business "beginning June 15, 2018 and ending December 31, 2018. Exhibit 1, at Section 1.3.

d.      That the Estimated Purchase Price shall be adjusted by a calculation of the Working Capital of FoneGear as of 11:59 PM on March 15, 2018 (the "Calculation Time"), defined as the difference between FoneGear's current assets less its current liabilities as of the Calculation Time, calculated in accordance with Generally Accepted Accounting Principles ("GAAP"), and that while a positive Working Capital would result in a positive adjustment to the Estimated Purchase Price, a negative Working Capital results in a reduction to the Estimated Purchase Price. For purposes of such calculations, the Agreement expressly limited the amount of Accounts Receivable to a maximum of $200,000. Exhibit 1, at Section 1.5(a).

e.      That "if there is a negative Adjustment Amount, Seller [Counter-Defendant Eisenbraun] shall pay such amount to Buyer [Counter-Plaintiff Tek Mobile, Inc.] …." Exhibit 1, at Section 1.5(d).

10.     During initial meetings concerning the negotiations over the potential purchase of FoneGear, Eisenbraun permitted only limited review of certain pre-printed documents concerning the operations and financial records of FoneGear.   Upon information and belief, Counter-Plaintiffs were not permitted access to FoneGear's actual accounting system, data, SAS system, or other real time financial data with which to evaluate the financial status of FoneGear.

11.     Counter-Plaintiffs were not permitted access to FoneGear's SAS inventory, cost, accounting or other financial data systems until after the Closing Date

of the proposed sale and following transfer of ownership of the membership interest in FoneGear to Tek Mobile, Inc.

12.    Upon information and belief, after the Closing Date, it was discovered that many necessary accounting entries with respect to determining FoneGear's true financial status, including its assets and liabilities, were not properly entered into the books of FoneGear prior to the Calculation Time and, as a result of poor bookkeeping and disorganized files as left by Eisenbraun, Tek Mobile, Inc. was and, at present, is hampered in its ability to ascertain the total assets and liabilities existing as of the Calculation Time of the Agreement.

13.    This failure to properly and timely enter information by Defendant Eisenbraun, and/or his employees, officers, directors, agents, and representatives materially inhibited and delayed Tek Mobile Inc.'s ability to conduct both its due diligence investigation, and effectively determine the financial status of the Company following the Closing Date for many months.

14.    Upon information and belief FoneGear was unprofitable and lost substantial amounts of money for significant periods prior to the purchase by Tek Mobile, Inc.

15.    At or near the Closing Date under the Agreement, Tek Mobile, Inc. in good faith paid to, and Eisenbraun received a payment of $250,000 toward the Estimated Purchase Price for the membership interest in FoneGear.

16.     Prior to the Closing Date, Tek Mobile, Inc. is informed and believes that it was prevented by Eisenbraun or his agents, employees and representatives from accessing the real and actual books and records of the FoneGear, its SAS and accounting systems, bank accounts, and other actual financial records.

17.     Subsequent to Closing Date, Tek Mobile, Inc., is informed and believes that it was unable to obtain accurate information sufficient to effectively prepare working papers, balance sheets and an accurate accounting of current assets, current liabilities and working capital due to the failure of Eisenbraun, and/or FoneGear's prior officers, directors, members, employees and/or representatives to timely and correctly enter financial data including, but not limited to liabilities, inventory, trade returns and other material items.

18.     Upon information and belief, the representations made by Eisenbraun prior to the Closing Date for the transaction grossly overstated FoneGear's current assets and grossly understated FoneGear's current liabilities.

19.     Upon information and belief, the alleged current inventory of products held by FoneGear as of March 15, 2018 was largely worthless resulting an overstatement of the believed inventory by hundreds of thousands of dollars.

20.     Upon information and belief, the estimated value of "Inventory in Transit" referenced in the Agreement was grossly overstated for the reason that if it was booked into the inventory there was no corresponding account payable booked to liabilities of the company.

21.    Eisenbraun wrongfully claims that he is owed additional moneys from Counter-Plaintiffs under the Agreement, but in actuality it is believed, based upon the information obtained to date that Tek Mobile, Inc. is owed a refund of the money it paid, plus such excess as determined by the ultimate accounting of Current Assets less Current Liabilities under the Agreement.

22.    To the extent that the calculation of the Adjustment Amount results in a negative adjustment equal to or in excess of $500,000, neither Counter Plaintiffs TEK MOBILE, INC. nor HONG LIP YOW have any monetary liability to Counter-Defendants.

23.    To the extent the correctly calculated negative Adjustment Amount exceeds $500,000, Eisenbraun is liable to Tek Mobile, Inc. for all such amounts in excess of $500,000, including the return or all or a portion of the initial $250,000 payment toward the Estimated Purchase Price, and also including any amounts exceeding the initial payment equal to the amount the negative Adjustment Amount exceeds $750,000.

24.    Upon information and belief, the misstatements of current assets, inventory and liabilities and other financial information in connection with FoneGear, made by Eisenbraun, and/or his employees, agents, attorneys, or representatives in the negotiation of and closing of the Agreement constitute a breach of Eisenbraun's representations, warranties, covenants and/or obligations under the Agreement, and precede any allege default, breach or failure on the part of Counter-Plaintiffs.

25.     Eisenbraun's demand for payment not due to him and his filing of the instant lawsuit by Counter-Defendants constituted a material breach of his obligations under the Agreement.

## COUNT 1 – BREACH OF CONTRACT

26.     Counter-Plaintiffs incorporate herein the Allegations set forth above under Paragraphs 1 through 26.

27.     Counter-Plaintiffs and Eisenbraun entered into a valid contract as set forth above.

28.     Eisenbraun materially breached the Agreement between the parties by undertaking the actions or failing to act as alleged in the preceding paragraphs.

29.     Counter-Plaintiffs have been damaged as a direct result of the material breach by Eisenbraun.

30.     Counter-Defendants' actions in failing to properly record in the books of the Company the correct assets and liabilities, breached its obligations under the Agreement and thereby discharged and prevented Counter-Plaintiffs from their ability to timely prepare an accounting of the current assets and liabilities called for by the Agreement and has caused financial damage to Counter-Plaintiffs.

## COUNT 2 - ACCOUNTING

31.     Counter-Plaintiffs incorporate herein the Allegations set forth above under Paragraphs 1 through 30.

32.     Under the terms of the Agreement an accounting of current assets and liabilities as of the Calculation Time under the Agreement is required.

33.     Eisenbraun possesses knowledge and information as to the true and correct current assets and liabilities of the Company as of the Calculation Time and for the periods prior to the Calculation Time under the Agreement and during his ownership and control of the Company.

34.     FoneGear is a Michigan Limited Liability Company.

35.     Tek Mobile, Inc. is the current sole member of FoneGear.

36.     Pursuant to MCL 450.4503 (5) Tek Mobile, Inc. is entitled to have a formal accounting of the Company under the aforementioned circumstances from Eisenbraun.

37.     In order to properly determine the adjusted sales price under the Agreement an accounting from Counter-Defendants is necessary and appropriate.

## COUNT 3 - DECLARATORY RELIEF

38.     Counter-Plaintiffs incorporate herein the Allegations set forth above under Paragraphs 1 through 37.

39.     Based on the foregoing facts, there exists an actual controversy between the parties, and a multiplicity of litigation will be avoided if all of these issues are determined by the court at one time.

40.     This Court has the power under 28 U.S.C. § 2201 and Fed. R. Civ. Proc. 57 to adjudicate the matters at issue and enter its judgment declaring the rights of all

parties to this action under the Agreement and awarding a judgment in favor of Counter-Plaintiffs.

41.    It is necessary for the Court to adjudicate and declare the rights of the parties under the Agreement in this action, to guide the parties' future conduct, preserve the parties' legal rights under the Agreement, and provide full and fair relief and resolution of the dispute between the parties.

WHEREFORE, Counter-Plaintiffs TEK MOBILE, INC. and HONG LIP YOW request that this Honorable Court enter judgment awarding damages to Counter-Plaintiffs for the breach of contract by Counter-Defendants, including costs, expenses and reasonable attorney's fees incurred in this action by Counter-Plaintiffs, and enter an order requiring Counter-Defendants' account to Counter-Plaintiffs as to all relevant information relating to the correct current assets and liabilities of the Company as of the Calculation Time, and/or declaring the rights of the parties under the Agreement, including but not limited to entering judgment in favor of Counter-Plaintiffs and against Counter-Defendants for a refund of all or a portion of funds paid to Eisenbraun by Tek Mobile, Inc., and awarding Counter-Plaintiffs further damages, including costs, expenses and reasonable attorney's fees as warranted based on the final accounting of

the Company, and such other relief as the Honorable Court deems just and proper.

**THAV GROSS PC**

Date:  August 17, 2018          By:     /s/Kenneth L. Gross
**Kenneth L. Gross (P34734)**
**Jeffrey B. Linden (P58007)**
Attorneys for Defendants/Counter-Plaintiffs
30150 Telegraph Road, Suite 444
Bingham Farms, MI 48025
Tel:            (248) 645-1700
Fax:           (248) 645-8205
Email:        kengross@thavgross.com
Email:        jlinden@thavgross.com

# EXHIBIT 1

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

## OF

## FONEGEAR, LLC

## BY AND BETWEEN

## KENNETH D. EISENBRAUN, SELLER

## AND

## TEK MOBILE, INC., BUYER

## <u>MEMBERSHIP INTEREST PURCHASE AGREEMENT</u>

This **MEMBERSHIP INTEREST PURCHASE AGREEMENT** (hereinafter the "Agreement") is entered as of March 20, 2018 by and between **Kenneth D. Eisenbraun**, an individual residing in the State of Michigan (hereinafter the "Seller") and **TEK Mobile, Inc.**, a California corporation (hereinafter "Buyer"). The Seller and the Buyer are referred to, individually, as a "Party" and, collectively, as the "Parties."

### <u>RECITALS</u>

WHEREAS, Seller is a member of, and the legal and beneficial owner of a one hundred percent (100%) of the outstanding membership interests (hereinafter "Interests") in FoneGear, LLC, a limited liability company organized and existing under the laws of the State of Michigan (hereinafter the "Company");

WHEREAS, Seller wishes to sell to Buyer Interests, comprising all of the outstanding limited liability interest in the Company;

WHEREAS, Buyer desires to acquire all of Seller's Interests in the Company pursuant to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the covenants, agreements, representations and warranties, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1
## SALE AND PURCHASE OF INTERESTS

Section 1.1 <u>Sale and Purchase</u>. Subject to the terms and conditions set forth herein, at the Closing (as defined below), the Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase, acquire, accept and receive from the Seller, all of the Seller's right, title and

interest in, under and to the Interests, free and clear of all liens, encumbrances, security interests, charges, mortgages, indentures, pledges, options, voting trusts, restrictions and claims of any kind (collectively, "Liens").

Section 1.2    Purchase Price and Payment. The total purchase price for the Interests shall be seven hundred fifty thousand United States Dollars ("USD") (USD $750,000) (the "Estimated Purchase Price"), minus or plus any adjustments pursuant to Section 1.3 through 1.5 (the "Purchase Price"). The Purchase Price shall be payable as follows:

(a)    The amount of two hundred fifty thousand United States Dollars (USD 250,000) ("Initial Payment") shall be paid to Seller on or before March 20, 2018 to such account as Seller shall have designated in writing at the Closing; and

(b)    as to the balance of the Purchase Price, by paying such balances to Seller in three equal installments on June 15, 2018, September 15, 2018, and December 15, 2018.

Section 1.3    Purchase Price Adjustment – Lease. The Estimated Purchase Price shall be downward adjusted for half of all rent due under the lease, as amended, existing as of the date hereof, between 2139 Commerce Park Associated, L.L.C. and Company (the "Lease") beginning June 15, 2018 and ending December 31, 2018.

Section 1.4    Purchase Price Adjustment – Cash. The purchase and sale does not include cash of Company as of the 11.59 p.m. on March 15, 2018 ("Calculation Time"). Ken will be withdrawing a total of $71,158.95; which is subject to verification after closing.

Section 1.5    Purchase Price Adjustment - General.

(a)    Buyer shall cause Company to prepare and deliver to Seller 60 days following the Closing Date: (i) a compiled balance sheet of the Company as of the Calculation Time (the "Closing Balance Sheet") prepared in accordance with GAAP applied consistently with the past practices of the Company (to the extent consistent with the preparation of the Financial Statements); and (ii) a statement setting forth the calculation of the current assets less current liabilities ("Working Capital of Company") as of the Calculation Time determined by reference to the Closing Balance Sheet (the "Working Capital Statement"), which statement shall be calculated in accordance with GAAP (to the extent consistent with the preparation of the Financial Statements) and shall include the amount of the Company's Working Capital (the "Adjustment Amount") as of the Calculation Time, it being understood that a positive Working Capital amount will result in an equivalent positive Adjustment Amount and a negative Working Capital amount will result in an equivalent negative Adjustment Amount. Notwithstanding the above, in no event shall the account receivable be more than two hundred thousand United States Dollars (USD $200,000) for the purposes of calculating the current assets. No change in accounting principles and practices shall be made from those described above, including with respect to the nature or classification of accounts. No reserves or other accruals shall be increased or created. Buyer shall provide, or cause to be provided to Seller,

copies of all working papers ("Purchase Price Adjustment Documents") resulting from, or used in connection with, the preparation of the Closing Balance Sheet and Adjustment Amount.

(b)       On or prior to the 20th Business Day after Seller's receipt of the Purchase Price Adjustment Documents (such 20 Business Day period, the "Objection Period"), Seller may give Buyer a written notice (the "Objection Notice") stating in reasonable detail Seller's objections to the Purchase Price Adjustment Documents and the calculations set forth therein. Any Objection Notice shall specify in reasonable detail the dollar amount and nature of any objection and the basis therefor. Except to the extent that Seller makes a specific objection to a specific determination set forth on a Purchase Price Adjustment Documents pursuant to the Objection Notice delivered to Buyer within the Objection Period, the Purchase Price Adjustment Documents will be conclusive and binding upon the parties hereto for purposes of determining the adjustment in this Section.

(c)       If Seller delivers a timely Objection Notice as described this Section, then Buyer and Seller will negotiate in good faith to resolve their disputes regarding the Purchase Price Adjustment Documents. If Buyer and Seller are unable to resolve all disputes regarding the Purchase Price Adjustment Documents on or prior to the 10th day after Buyer's receipt of the Objection Notice, then Seller and Buyer will retain an independent accounting firm (selected either by mutual agreement or, in the absence of mutual agreement, by random choice after eliminating any such firm which is conflicted or otherwise unable to participate) (an "Independent Accounting Firm"), to resolve the dispute as soon as practicable, and in any event within 20 days of its appointment. Seller and Buyer shall provide to the Independent Accounting Firm its view of the correct amount of the Adjustment Amount and the constituent items forming part of the Working Capital Statement. The Independent Accounting Firm shall act as an expert and not as an arbitrator to determine, based solely on the written submissions of the parties and not by independent investigation, only the specific items under dispute by Seller and Buyer. The Independent Accounting Firm shall render a written report as to the resolution of the dispute and the resulting computation of the Adjustment Amount. The Adjustment Amount as determined by the Independent Accounting Firm will, absent manifest error, be conclusive and binding upon the parties hereto and will constitute the Adjustment Amount for all purposes of this Section. In resolving any disputed item, the Independent Accounting Firm: shall be bound by the provisions of this Section; and may not assign a value to any item greater than the greatest value for such item claimed by Seller or Buyer or less than the smallest value for such item claimed by Seller or Buyer. Buyer and Seller shall pay equally all fees, costs and expenses of the Independent Accounting Firm in resolving the dispute.

(d)       If there is a negative Adjustment Amount, Seller shall pay such amount to Buyer by wire transfer of immediately available funds. If there is a positive Adjustment Amount, Buyer shall pay such amount to Seller by wire transfer of immediately available funds. Any payment made pursuant to this Section shall be made within two (2) Business Days (i) if no Objection Notice is delivered, after the Objection Period has expired, or (ii) if an Objection Notice is delivered, after all disputes are finally resolved pursuant to this Section.

(e)      Any payment made pursuant to this Section will be treated as an adjustment to the Estimated Purchase Price for all purposes, unless a contrary treatment is required by applicable Laws.

(f)      "Current Assets" shall mean at any particular time, the current assets of the Company at such time classified in accordance with GAAP applied on a basis consistent with the Financial Statements (to the extent consistent with the preparation of the Financial Statements), including: cash (if any), inventory (which includes products in transit with an estimated value of one hundred sixteen thousand United States Dollars (USD $116,000)); accounts receivable, less an allowance for doubtful accounts, and prepaid expenses and deposits; but excluding future Tax assets. For purposes of this Section, the amount of accounts receivable, less an allowance for doubtful accounts, to be included in Current Assets shall be as follows:  (i) total of all accounts receivable as of the Calculation Time, minus (ii) total of all allowances as of the Calculation Time; provided, however, the foregoing shall not exceed US$200,000.

(g)      "Current Liabilities" means, at any particular time, the current liabilities of the Company at such time, classified in accordance with GAAP applied on a basis consistent with the Financial Statements (to the extent consistent with the preparation of the Financial Statements), including: trade payables and outstanding checks; accrued expenses; Taxes payable, namely, 2017 Winter Tax and Summer Tax; one half of the 2018 Winter Tax with respect to the lease; the negotiated Canada Suncor Credit; 2017 Harley-Davidson audit settlement; payroll accrual; but excluding any indebtedness of the Company and income Taxes payable for periods after the Calculation Time.

## ARTICLE 2
## THE CLOSING

Section 2.1      Closing. Subject to the satisfaction or waiver of each of the conditions set forth herein, the consummation of the transaction contemplated by this Agreement (the "Closing") shall take place on **March 20, 2018** or at such other time and on such other date as may be mutually agreed upon by the Parties (the "Closing Date").

Section 2.2      Deliveries by Seller. At the Closing, the Seller shall deliver to Buyer the following documents or instruments, in form and substance reasonably satisfactory to Buyer:

(a)      all instruments, if any, evidencing any of the Interests.

(b)      if applicable, a true and correct copy of the unanimous written consent of the member(s) of FoneGear, LLC, authorizing the execution and delivery of any other agreements, statements, certificates, instruments or other documents to be executed and delivered by Fonegear, LLC at the Closing pursuant to this Agreement (collectively, the "Seller Documents") to which FoneGear, LLC is a party;

(c)      the resignation of the Manager of the Company, duly executed by the Company's Manager;

(d)    an Assignment Separate From Certificate, in the form attached hereto as **Exhibit A**, duly executed in blank by Mr. Kenneth D. Eisenbraun, together with any other documents that are necessary to transfer to the Company good and valid title to all Interests and any necessary transfer tax stamps affixed or accompanied by evidence that all transfer taxes have been paid; and

(e)    an Agreement and Consent to Admit New Member, in the form attached hereto as **Exhibit B**, duly executed by Kenneth D. Eisenbraun and FoneGear, LLC.

(f)    such further documents (including, without limitation, instruments of assignment, conveyance, transfer or confirmation) as may be reasonably necessary for (i) the Seller to convey and transfer to Buyer, and Buyer to acquire and accept from the Seller, the Interests, free and clear of all Liens, and (ii) Buyer to become a member of the Company, or as may be otherwise reasonably requested by Buyer.

Section 2.3    <u>Deliveries by Buyer</u>. At the Closing, Buyer shall pay Seller the Initial Payment as provided in Section 1.2 hereof and deliver to the Seller the following documents or instruments, in form and substance reasonably satisfactory to the Seller:

(a)    a true and correct copy of the resolutions of the Board of Directors of Buyer, authorizing the execution and delivery of this Agreement and any other agreements, statements, certificates, instruments or other documents to be executed and delivered by Buyer at the Closing pursuant to this Agreement (collectively, the "Buyer Documents") and the consummation by Buyer of the transaction contemplated hereby;

(b)    such further documents (including, without limitation, instruments of assumption, acquisition, acceptance or confirmation) as may be reasonably necessary for (i) the Seller to convey and transfer to Buyer, and Buyer to acquire and accept from the Seller, the Interests, free and clear of all Liens, and (ii) Buyer to become a member of the Company, or as may be otherwise reasonably requested by the Seller.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

Section 3.1    <u>Representations and Warranties of Seller and Company</u>. Seller represents and warrants to Buyer, as of the date hereof and as of the Closing Date, as follows:

(a)    <u>Interest</u>. The Interests constitute Seller's entire ownership and Interests (whether record, beneficial or otherwise) in FoneGear, LLC, and the Interests represent exactly 100% of the outstanding units of FoneGear, LLC. Seller has good and marketable title to all of the Interests, free and clear of all Liens. Without limiting the generality of the foregoing, no individual (other than Seller) or entity has any beneficial interest in or a right to acquire or vote any of the Interests otherwise than pursuant to this Agreement. The Interests are free and clear of all Liens. At the Closing, the Buyer will acquire good and valid title to all of the Interests, free and clear of all Liens.

(b)     _Authority; Validity and Enforceability._ Seller has the capacity to execute, deliver and perform his obligations under this Agreement. This Agreement has been duly executed and delivered by Seller and, assuming due authorization, execution and delivery by the Buyer, represents the legal, valid and binding obligation of Seller, enforceable against him in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, fraudulent conveyance and other laws, rules and regulations and principles of equity affecting creditors' rights and remedies generally. Other than such actions as are expressly required by this Agreement, no further action on the part of Seller or any other person is or will be required in order to transfer and assign all of the Interests to the Buyer.

(c)     _No Conflict._ Neither the execution and delivery of this Agreement by Seller, nor the performance by Seller of his obligations hereunder: (i) will violate, conflict with or result in a breach of any applicable law or duty, including without limitation, tort duties; (ii) infringe, misappropriate, or otherwise violate any proprietary interest of any third party, including, without limitation, intellectual property interests; or (iii) breach or terminate any contractual right or interest of any third party, or give any individual or entity any additional rights or compensation under, or the right to terminate or accelerate, or constitute (with notice or lapse of time, or both) a default under the terms of any note, deed, lease, indenture, security agreement, mortgage, commitment, contract, covenant, agreement, license or other instrument or oral understanding to which Seller is a party or by which Seller is bound.

(d)     _Consents._ No consent, approval or authorization of any individual or entity is required in connection with the execution, delivery and performance by Seller of this Agreement or any instrument required to be delivered by Seller at the Closing or the consummation of the transactions contemplated hereby or thereby.

(e)     _No Lawsuits._ To the best of Seller's knowledge, there are no actions, suits, proceedings, claims or demands of any kind, pending or threatened (collectively, "Claims"), against or affecting Seller or the Company that restrain or prohibit (or seek to restrain or prohibit) the consummation by Seller of the transaction contemplated hereby.

(f)     _Authority as Manager._ Mr. Kenneth D. Eisenbraun, in his capacity as Manager of the Company, consents to the sale of the Interests as contemplated by this Agreement, pursuant to Section 6 of the Company's Operating Agreement.

(g)     _Books and Records._ The records regarding the transfer of Interests and records showing the equity interests of the Company, all of which have been made available to Buyer, are, to the knowledge of the Seller, complete and correct in all material respects and have been maintained in accordance with sound business practices. Upon or immediately following the Closing Date, the Seller shall cause all of those records to be delivered to the Buyer, provided that the Seller may retain a copy of any such records that in his opinion may be required to be maintained by the Seller in connection with the taxation of the Seller with respect to his ownership of the Interest prior to the Closing Date.

(h)     <u>Financial Statements</u>. The Seller has delivered to Buyer the compiled balance sheets of the Company and compiled related statements of income and cash flows for the fiscal years ended December 31, 2015 and December 31, 2016 and a preliminary draft of the compiled balance sheet of the Company and compiled related statements of income and cash flows for the fiscal year ended December 31, 2017 (the "Financial Statements"). To the knowledge of the Seller, the Financial Statements fairly present in all material respects the financial condition, results of operations, members' equity accounts, and cash flow of the Company as at the respective dates of and for the periods referred to in the Financial Statements. Except as set forth in the Independent Accountant's Compilation Report attached to the Financial Statements, the Financial Statements have been prepared in accordance with United States generally accepted accounting principles ("GAAP").

(i)     <u>Ordinary Course of Business</u>. To the knowledge of the Seller and except as communicated in writing to Hong Lip Yow or Fred Creamer, Seller has managed and operated the Company in the ordinary course of business and consistent with past practices in all material respects.

(j)     <u>No Undisclosed Liabilities</u>. To the knowledge of the Seller and except as communicated in writing to Hong Lip Yow or Fred Creamer, the Company has no material liabilities except for liabilities reflected or reserved against in the balance sheets of the Company and current liabilities incurred in the ordinary course of business of Seller since December 31, 2017.

(k)     <u>Full Disclosure</u>. The representations and warranties contained in this Agreement and in any certificate or other document delivered under Section 2.2 of this Agreement are accurate and complete, do not contain any untrue statement of a material fact or, considered in the context in which presented, omit to state a material fact necessary in order to make the representations and warranties contained herein and therein not misleading.

(l)     EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS SECTION 3.1, SELLER MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND SELLER HEREBY DISCLAIMS ANY REPRESENTATION OR WARRANTY NOT CONTAINED IN THIS SECTION 3.1.

Section 3.2     <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller, as of the date hereof and as of the Closing Date, as follows:

(a)     <u>Authority; Validity and Enforceability</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of California. Buyer has the requisite corporate power and authority to carry on the business in which it is engaged, to own its assets, to execute, deliver and perform its obligations under this Agreement and the Buyer Documents, and to consummate the transaction contemplated hereby. This Agreement has been duly executed and delivered by Buyer and, assuming due authorization, execution and delivery by Seller, represents the legal, valid and binding obligation of Buyer, enforceable against it in accordance with their respective terms, subject to applicable bankruptcy, insolvency,

reorganization, moratorium, liquidation, fraudulent conveyance and other laws, rules and regulations and principles of equity affecting creditors' rights and remedies generally.

(b) <u>No Conflict</u>. Neither the execution and delivery of this Agreement by Buyer, nor the performance by Buyer of its obligations hereunder: (i) will violate, conflict with or result in a breach of its constituent documents or any applicable law or duty, including without limitation, tort duties; or (ii) breach or terminate any contractual right or interest of any third party, or constitute (with notice or lapse of time, or both) a default under the terms of any note, deed, lease, indenture, security agreement, mortgage, commitment, contract, covenant, agreement, license or other instrument or oral understanding to which Buyer is a party or by which Buyer is bound.

(c) <u>Consents</u>. No consent, approval or authorization of any individual or entity is required in connection with the execution, delivery and performance by Buyer of this Agreement or any instrument required to be delivered by Buyer at the Closing or the consummation of the transactions contemplated hereby or thereby.

(d) <u>Knowledge</u>. Buyer has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of its investment and is able to bear the economic risks of the Buyer's investment and participation in the Company. Buyer has acquired all information it has requested about the Company and considers necessary to reach an informed and knowledgeable decision to acquire the Interests.

(e) <u>Further Assurances</u>. Subsequent to the execution and delivery of this Agreement and without any additional consideration, each party hereto, at the written request of the other party hereto, will execute and deliver any further legal instruments, and take all such other actions, which are or may become reasonably necessary or helpful to effectuate the purposes of this Agreement.

(f) <u>No Claims</u>. To the best of Buyer's knowledge, there are no Claims against or affecting Buyer that restrain or prohibit (or seek to restrain or prohibit) the consummation by Buyer of the transaction contemplated hereby.

(g) <u>Financial Capacity</u>. Buyer has the financial resources on hand to perform its obligations hereunder, including making the payments contemplated in Article 1.

## ARTICLE 4
## COVENANTS

Section 4.1 <u>Membership in Company</u>. The Seller (including, in the case of Mr. Kenneth D. Eisenbraun, in his capacity as Manager of the Company) hereby (a) consents to Buyer being admitted as and becoming a member of the Company at the Closing and (b) acknowledges and agrees that, at the Closing, Seller shall cease (i) to be a member of the Company and (ii) to have the power to exercise any right, power or remedy as a member of the Company.

Section 4.2    Post-Closing Covenants. Seller agrees that after the Closing Date, Seller shall make all filings, give all notices, and transfer all accounts that Seller is required to make and give to close the transaction contemplated in this Agreement.

Section 4.3    Employees. Seller shall cause the termination of employment by United Global Sourcing Inc. ("UGS") of, and Buyer shall subsequently cause the hiring by the Company of, the following employees on March 30, 2018: Chris Brecker, Fred Creamer, Shanni Novak, Charlene Oakes, Ryan Rossi, Dennis Scala, and Barbara Zygolewski (hereinafter the "Transitioning Employees"). Seller shall cause UGS to pay all required compensation and employee-related benefits directly to the Transitioning Employees through March 30, 2018, and Buyer shall reimburse UGS for any required compensation and health insurance, but not PTO or severance benefits, that accrued after March 15, 2018 and were actually paid out by UGS (the "Reimbursement Amount"). UGS shall send an invoice to Buyer setting forth the Reimbursement Amount no later than April 9, 2018. Buyer shall pay the Reimbursement Amount to UGS no later than April 13, 2018 by wire transfer of immediately available funds to an account specified by UGS.

## ARTICLE 5
## CONDITIONS TO CLOSING

Section 5.1    Conditions Precedent to Obligations of Seller. The obligation of the Seller to sell and transfer the Interests and to consummate the transaction contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of all of the conditions precedent set forth in this Section. Seller may waive any or all of these conditions, in whole or in part, without prior notice, in his sole and absolute discretion.

(a)    All representations and warranties of Buyer contained in this Agreement or in any of the Buyer Documents shall be true and correct in all material respects as of the date hereof or thereof and as of the Closing Date;

(b)    Buyer shall have performed and complied with, in all material respects, all covenants, obligations and conditions required by this Agreement to be performed or complied with by Buyer prior to or on the Closing Date;

(c)    No injunction, order or decree of any Governmental Authority shall be in effect which restrains or prohibits the consummation of the transaction contemplated by this Agreement at the Closing;

(d)    The form and substance of all Buyer Documents shall be reasonably satisfactory to the Seller; and

(e)    Buyer shall have paid the Initial Payment to the Seller in accordance with Section 1.2 hereof.

Section 5.2    Conditions Precedent to Obligations of Buyer. The obligation of Buyer to purchase the Interests and to consummate the transaction contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of all of the conditions precedent set forth in this Section. Buyer may waive any or all of these conditions, in whole or in part, without prior notice, in its sole and absolute discretion.

(a)     All representations and warranties of the Seller contained in this Agreement or in any of the Seller Documents shall be true and correct in all material respects as of the date hereof or thereof and as of the Closing Date;

(b)     The Seller shall have performed and complied with, in all material respects, all covenants, obligations and conditions required by this Agreement to be performed or complied with by the Seller prior to or on the Closing Date;

(c)     No injunction, order or decree of any Governmental Authority shall be in effect which restrains or prohibits the consummation of the transaction contemplated by this Agreement at the Closing;

(d)     The form and substance of all Seller Documents shall be reasonably satisfactory to Buyer; and

(e)     The Seller shall have conveyed the Interests to Buyer in accordance with this Agreement.

## ARTICLE 6
## SURVIVAL; DISCLAIMER; INDEMNIFICATION

Section 6.1     Survival of Provisions; Cure Rights.

(a)     All representations and warranties of Buyer and the Seller contained in this Agreement or in any Buyer Documents or Seller Documents shall survive the Closing for a period of one (1) year. Any claim for indemnification hereunder for a breach of a representation or warranty may not be brought after the expiration of such applicable period. Any claim for indemnification in respect of a covenant or obligation of Buyer or the Seller hereunder to be performed prior to the Closing may not be made after a one year period following the Closing Date. The covenants and obligations under this Agreement to be performed after the Closing shall survive the Closing until fully performed.

(b)     For all purposes under this Agreement, the existence or occurrence of any event or circumstance that constitutes or causes a breach of a representation or warranty of the Seller or Buyer under this Agreement on the date such representation or warranty is made shall be deemed not to constitute a breach of such representation or warranty if such event or circumstance is cured in all material respects on or before the expiration of twenty (20) days from the receipt by such Party of written notice thereof from the other Party.

Section 6.2     Disclaimers and Waivers. EACH OF SELLER AND BUYER AGREES THAT IT SHALL NOT BE ENTITLED TO RECOVER, AND HEREBY DISCLAIMS AND WAIVES ANY RIGHT THAT IT MAY OTHERWISE HAVE TO RECOVER, LOST PROFITS OR REVENUES, LOSS OF USE OR GOODWILL OR SPECIAL, CONSEQUENTIAL, INCIDENTAL, RESULTANT, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES AS A RESULT OF ANY BREACH OR ALLEGED BREACH BY THE OTHER PARTY OF THIS AGREEMENT OR ANY OTHER MATTER RELATING TO THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY.

Section 6.3     Indemnity.

(a)     Subject to the limitations set forth in this Article 6, each of the Seller shall indemnify, defend and hold harmless Buyer and its Affiliates and their respective shareholders, members, partners, directors, officers, managers, employees, agents and representatives (individually a "Buyer Indemnified Party" and, collectively, the "Buyer Indemnified Parties") from and against any and all actions, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, liabilities, penalties, fines, amounts paid in settlement, obligations, losses, costs, expenses and fees, including, without limitation, court costs and reasonable attorneys' fees and expenses (collectively "Losses") arising out of, resulting from, or in connection with any breach of any representation, warranty, covenant or obligation made by such Seller in this Agreement or in any Seller Documents.

(b)     Subject to the limitations set forth in this Article 6, Buyer shall indemnify, defend and hold harmless the Seller and his Affiliates and their respective shareholders, members, partners, directors, officers, managers, employees, agents and representatives (individually a "Seller Indemnified Party" and, collectively, the "Seller Indemnified Parties") from and against any and all Losses arising out of, resulting from, or in connection with any breach of any representation, warranty, covenant or obligation made by Buyer in this Agreement or in any Buyer Documents or in connection with the transaction contemplated by this Agreement.

(c)     A Party seeking indemnification pursuant to this Section 6.3 (an "Indemnified Party") shall give written notice to the Party from whom such indemnification is sought (the "Indemnifying Party") of the assertion or commencement of any Claim, in respect of which indemnity may be sought pursuant to this Section 6.3 and shall give the Indemnifying Party such information with respect thereto as the Indemnifying Party may reasonably request, but failure to give such notice shall not relieve the Indemnifying Party of any liability hereunder (except to the extent that the Indemnifying Party may have suffered actual prejudice thereby). Any survival period limitation specified in Section 6.1 hereof shall not apply to a Claim which has been the subject of notice from the Indemnified Party to the Indemnifying Party given prior to the expiration of such period. The Indemnified Party shall have the burden of proof in establishing the amount of its Losses.

(d)     In the event of the initiation of any action, suit or proceeding against the Indemnified Party by a Person other than the Parties, the Indemnifying Party shall have the sole and absolute right after the receipt of notice, at its option and at its own expense, to be represented by counsel of its choice and to control, defend against, negotiate, settle or otherwise deal with any Claim which relates to any Losses sought to be indemnified against hereunder; provided, however, that the Indemnified Party may participate in any such action, suit or proceeding with counsel of its choice and at its expense. The Parties agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Claim. To the extent that the Indemnifying Party elects not to defend such Claim, and the Indemnified Party defends against or otherwise deals with any such Claim, the Indemnified Party may retain counsel, reasonably acceptable to the Indemnifying Party, and control the defense of such proceeding. Neither the Indemnifying Party nor the Indemnified Party may settle any Claim to the extent that such settlement obligates the other Party to pay money, to perform obligations or

to admit liability without the consent of such other Party, such consent not to be unreasonably withheld.

Section 6.4    Limitations on Indemnification. Notwithstanding any provision in this Agreement to the contrary, after the Closing the indemnification provided in Section 6.3 hereof shall constitute the sole and exclusive remedy of a Party for any disputes related to this Agreement or the transaction contemplated hereby and such Party waives all other remedies on account of such matters. The indemnification obligation under Section 6.3 hereof shall cover all Losses with respect to any and all of the specific matters set forth in Section 6.3, except that an Indemnifying Party shall not, except in cases of fraud, or willful or intentional misrepresentation, be liable for any damages that do not arise directly from the Indemnifying Party's breach and shall not be liable for any damages suffered or incurred by an Indemnified Party in enforcing this indemnity (including, without limitation, costs of investigation, attorneys' fees, etc.) if it is finally determined that the Indemnified Party is not entitled to indemnification under this Article 6.

**ARTICLE 7**
**MISCELLANEOUS**

Section 7.1    Notices. All notices, requests, consents, demands and other communications required or permitted to be given under this Agreement (collectively, "Notices") shall be in writing, be in the English language and be sent by certified or registered mail (return receipt requested), reputable overnight courier service, hand or confirmed facsimile. Notices shall be deemed to have been properly given and made five (5) business days after having been sent by mail, two (2) business days after having been sent by courier service, and one (1) business day after having been sent by hand or facsimile, in each case in compliance with this Section 7.1. Notices shall be addressed to the intended recipient at its address set forth below or to such other address as the intended recipient designates in writing to the other Parties:

|            |                                        |
|------------|----------------------------------------|
| If to Seller: | Kenneth D. Eisenbraun               |
|            | 5607 New King St., Suite 100           |
|            | Troy, MI 48098                         |
|            | P: (248) 421-9662                      |
|            |                                        |
| If to Buyer: | Hong Lip Yow                         |
|            | 3333 South Brea Canyon Road, Suite 206 |
|            | Diamond Bar, California 91765-3785     |
|            | P: (909) 248-5488                      |
|            | F: (909) 627-6228                      |

Section 7.2    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without regard to its choice-of-law and conflicts-of-laws rules.

Section 7.3    Further Assurances. From time to time prior to, at, and after the Closing, each Party shall execute and deliver all such documents and instruments and take all such actions as the other Party, being advised by counsel, shall reasonably request for the purpose of carrying out and effectuating the intent and purpose of this Agreement and the transaction contemplated hereby, including, without limitation, the execution and delivery of any and all confirmatory and other instruments, in addition to those to be delivered at the Closing, and any and all actions which may reasonably be necessary to effect the transaction contemplated hereby.

Section 7.4    Attorneys' Fees: Expenses. Each Party shall bear its own costs, expenses, and attorneys' fees in connection with the negotiation, preparation, execution and delivery of this Termination Agreement and the transactions contemplated herein. In the event of any dispute arising under or related to this Agreement, the prevailing party shall be entitled to reimbursement from the non-prevailing party of all fees, costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party.

Section 7.5    Severability. Any provision of this Agreement which is illegal, invalid or unenforceable in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction or the remaining provisions of this Agreement in any jurisdiction. If the final judgment of a court of competent jurisdiction declares that any provision of this Agreement is illegal, invalid or unenforceable, the Parties agree that such court shall have the power to modify such provision consistent with the intent of the Parties.

Section 7.6    Binding Nature: No Beneficiaries: Cumulative Rights. This Agreement shall be binding upon, and shall inure to the benefit of, the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer on any Person, other than the Parties and their respective successors and permitted assigns, any rights, remedies, benefits, obligations or liabilities under this Agreement, except as specifically provided in this Agreement or otherwise specifically agreed to in writing by the Parties. Except as otherwise expressly provided in this Agreement, the rights and remedies provided herein shall be cumulative and not exclusive of any other rights or remedies provided at law or in equity.

Section 7.7    Assignments. No Party may assign, transfer or delegate this Agreement or any of its rights or obligations under this Agreement without the prior written consent of the other Parties, which may be given or withheld in such other Party's sole and absolute discretion.

Section 7.8    Entire Agreement. This Agreement contains and constitutes the entire agreement of or among the Parties with respect to the subject matter of this Agreement, and supersedes all other prior or contemporaneous understandings, communications, commitments, undertakings, representations and agreements, oral or written, expressed or implied, of or among the Parties with respect to the subject matter of this Agreement.

Section 7.9    Specific Performance. The parties hereto hereby acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that each of the parties hereto, in addition to any other available rights or remedies, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms

and provisions hereof in any court of the United States or any state having jurisdiction, and each party hereto hereby expressly waives the defense that a remedy in damages will be adequate.

Section 7.10   Amendments. This Agreement may not be amended, modified, discharged or waived orally or by course of conduct, but only by an agreement in writing, signed by or on behalf of the Party against whom enforcement of any amendment, modification, discharge or waiver is sought.

Section 7.11   No Waivers. The failure or delay on the part of either Party to insist upon or enforce strict performance of any provision of this Agreement by the other Party, or to exercise any right, power or remedy under this Agreement, shall not be deemed or construed as a waiver thereof. A waiver by either Party of any provision of this Agreement or of any breach thereof shall not be deemed or construed as a general or continuing waiver of such provision or of any other provision, of any subsequent or other breach hereof or of any rights hereunder.

Section 7.12   Headings; Exhibits. The section headings contained in this Agreement are for convenience only and shall not be considered in the interpretation or construction of the provisions of this Agreement. The term "this Agreement" shall be deemed to include each of the exhibits hereto, any documents based on such exhibits and any other statement, certificate, instrument or other document furnished or delivered by the Parties pursuant to this Agreement.

Section 7.13   Certain Terms. The words "hereof," "herein", "hereunder" or "hereto" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision or paragraph of this Agreement. Defined terms in the singular include the plural and vice versa. The terms "including," "includes" and "include" shall be deemed to be followed by the words "without limitation" unless already so expressly stated. "Affiliate" means, in respect of any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such first Person or, in the case of an individual, any individual Person who is related by blood, marriage or adoption to such first Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (i) vote 50% or more of the securities having ordinary voting power for the election of directors (or individuals performing similar functions) of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. "Person" means an individual, corporation, company, limited liability company, partnership, limited liability partnership, association, joint venture, Governmental Authority, trust or any other entity or organization. "Governmental Authority" means any federal, state, local or foreign court or governmental or regulatory agency or authority, or any multinational or organizational body.

Section 7.14   Construction. The Parties have each participated in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

Section 7.15   Counterparts. This Agreement may be executed in any number of counterparts and such counterparts may be exchanged by means of electronic mail or facsimile transmission, and each of such counterparts shall be deemed an original but all of them together shall constitute one and the same instrument.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the Parties have caused this Membership Interest Purchase Agreement to be duly executed and delivered by their duly authorized representatives as of the date first written above.

**TEK MOBILE, INC.**      **KENNETH D. EISENBRAUN**

_____   _____

Hong Lip Yow,        Kenneth D. Eisenbraun, as Seller
on behalf of TEK Mobile, Inc.,
as its Chairman

The undersigned hereby personally guarantees the obligations of Buyer under this Agreement.

_____

Hong Lip Yow, individually

4834-8057-0975 9
088021.000999

MEMBERSHIP INTEREST PURCHASE AGREEMENT OF FONEGEAR, LLC BY AND BETWEEN
KENNETH D. EISENBRAUN, SELLER AND TEK MOBILE, INC., BUYER

IN WITNESS WHEREOF, the Parties have caused this Membership Interest Purchase Agreement to be duly executed and delivered by their duly authorized representatives as of the date first written above.

**TEK MOBILE, INC.**                                   **KENNETH D. EISENBRAUN**

_____          _____
Hong Lip Yow,                                         Kenneth D. Eisenbraun, as Seller
on behalf of TEK Mobile, Inc.,
as its Chairman

The undersigned hereby personally guarantees the obligations of Buyer under this Agreement.

_____
Hong Lip Yow, individually

4834-8057-0975.9
088021\000999

MEMBERSHIP INTEREST PURCHASE AGREEMENT OF FONEGEAR, LLC BY AND BETWEEN
KENNETH D. EISENBRAUN, SELLER AND TEK MOBILE, INC., BUYER

## EXHIBIT B

### FORM OF AGREEMENT AND CONSENT TO ADMIT NEW MEMBER

Reference is made to the Limited Liability Company Operating Agreement (the "Operating Agreement") of Fonegear, LLC, a Michigan limited liability company ("FoneGear").

In connection with the transfer by Kenneth D. Eisenbraun of all of his membership units of FoneGear, LLC to TEK Mobile, Inc., a California Corporation ("TEK Mobile"), each of the undersigned hereby consents to such transfer and agrees and consents to the admission of TEK Mobile as a "Member" and "Owner" of FoneGear, LLC for all purposes (including, without limitation, for purposes of the Operating Agreement). For clarity, this Agreement and Consent to Admit New Member satisfies all the conditions of Sections 6.1, 6.2 and 6.3 of the Operating Agreement.

Effective upon such transfer, pursuant to Section 4 of the Operating Agreement, TEK Mobile hereby appoints its Chairman, Hong, Lip Yow, as its representative for all votes, decisions and actions that TEK Mobile is permitted or required to make under the Operating Agreement, until such time as TEK Mobile has appointed a different representative, at its sole discretion. Each of the undersigned hereby consents to such appointment.

This Agreement and Consent to Admit New Member may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

**FONEGEAR, LLC**                                    **TEK MOBILE, INC.**

_____               _____
Kenneth D. Eisenbraun, its sole member         Hong Lip Yow, its Chairman

Date: _____               Date: _____

## **EXHIBIT A**

### **FORM OF ASSIGNMENT SEPARATE FROM CERTIFICATE**

### **FONEGEAR, LLC**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto TEK Mobile, Inc. a California corporation, all of the undersigned's right, title and interest in and to FoneGear, LLC, a Michigan limited liability company ("FoneGear"), including, without limitation, all of the undersigned's ownership and/or membership interests in FoneGear. This assignment shall be effective as of the date set forth below. Hereafter, the undersigned shall neither be a member nor an owner of FoneGear and shall have no right to receive from FoneGear any share of profits, losses and/or distributions (including, without limitation, any right of return from FoneGear upon its dissolution) to which the undersigned would otherwise be entitled absent this instrument.


_____    _____
Kenneth D. Eisenbraun                                       Date

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KENNETH D. EISENBRAUN, an
Individual, and UNITED GLOBAL
SOURCING, INC., a Michigan
corporation,

     Plaintiffs,

vs.

TEK MOBILE, INC., a California
corporation, and HONG LIP YOW,
an Individual,

     Defendants.

Case No. 18-cv-12013-VAR
Hon. Victoria A. Roberts

---

| **Thomas M. Schehr (P54391)** | **Kenneth L. Gross (P34734)** |
|---|---|
| **Andrew J. Kolozsvary (P68885)** | **Jeffrey B. Linden (P58007)** |
| DYKEMA GOSSETT PLLC | THAV GROSS PC |
| Attorneys for Plaintiffs | Attorneys for Defendants |
| 400 Renaissance Center, 37th Floor | 30150 Telegraph Road, Ste. 444 |
| Detroit, MI 48243 | Bingham Farms, MI 48025 |
| Tel:   (313) 568-6800 | Tel:   (248) 645-1700 |
| | Fax:   (248) 645-8205 |
| | Email:kengross@thavgross.com |
| | Email:jlinden@thavgross.com |

---

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2018, I electronically filed the following:

- ***Defendants' Counterclaim***

and this **Certificate of Service** with the Clerk of the Court for the United States District Court for the Eastern District of Michigan, Southern Division, using the ECF filing system, which will be sent electronically to all counsel of record.

I declare, under penalties of perjury, that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge and belief.

*/s/Lori-Anne F. Wood*

Lori-Anne F. Wood